

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00353-CV

———————————————————

IN THE INTEREST OF S.S., A CHILD

---

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-568527-15

---

Before Pittman, Gabriel, and Kerr, JJ.
Per Curiam Memorandum Opinion

## MEMORANDUM OPINION

After a bench trial in 2018, the visiting judge (trial court) terminated the parent–child relationships of Dale Fouse (Father) and Appellant Audrey Smith (Mother) with their son, Sam,[1] finding that Father had executed an unrevoked or irrevocable affidavit of relinquishment of his parental rights and that termination of the parental rights of both Father and Mother was in Sam's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K), (2). The trial court also found that Mother

- knowingly placed or knowingly allowed [Sam] to remain in conditions or surroundings which endanger[ed his] physical or emotional well-being . . . ; [and]

- engaged in conduct or knowingly placed [Sam] with persons who engaged in conduct which endanger[ed his] physical or emotional well-being . . . .

*Id.* § 161.001(b)(1)(D), (E).

Only Mother appealed. In two issues, she challenges the legal and factual sufficiency of the endangerment and best-interest findings against her. Because we hold that the evidence is sufficient to support the termination of Mother's parental rights, we affirm the trial court's judgment.

---

[1]*See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights termination cases and, if necessary to protect the minors' identities, to also use aliases to refer to their family members). In this opinion, we use aliases to refer to the children, their parents, and the foster parents.

## STATEMENT OF FACTS

### I.  Mother Had a History of Committing Violence and Endangering Her Children Before Sam's 2017 Removal.

#### A.  Mother Engaged in Family Violence Before Having Children.

Mother's estranged half-sister (Sister) testified that Mother was in the California juvenile system as a teenager and that after she aged out at eighteen years old and returned home, she assaulted their mother and little brother regularly.

#### B.  Mother Endangered Her Elder Son Before Sam Was Born.

Mother's son Adam (who is not a subject of this appeal) was born in July 2009, and Mother was divorced from her husband (Ex-Husband) in 2012.  Sister had been concerned about Mother's parenting of Adam from 2011 until Ex-Husband regained possession of him.  Regarding Mother's relationship with Adam:

- Sister believed there was a lack of attachment between Mother and Adam;

- Sister was concerned that Mother tried to drown Adam when he was two or two and a half (Mother had also accused Sister of drowning him when Sister had possession of him);

- Sister saw Mother deliver a "very hard slap" to Adam's head when he was two and a half.  It hurt him enough that he cried a while, and Sister's same-aged son, who observed it, cried too;

- Mother locked Adam in the bathroom at Sister's house; and

- Locks in Mother's home for Adam's room were on the exterior, not interior.

Mother's former boyfriend reported that during their relationship, Mother

3

would repeatedly lock then four-year-old Adam in the bedroom for long periods of time, causing him to urinate and defecate on himself.

### C. Sam Was Born After a Brief Relationship between Father and Mother.

After a two-month relationship with Father, Mother became pregnant with Sam in early 2014. During her pregnancy, Mother filed a complaint with the Grapevine Police Department alleging that Father had assaulted her and filed a different complaint with the Haltom City Police Department alleging that Father had sexually abused Adam. During the same period, Mother was caught on video covertly following Father into, inside, and outside a Saginaw Walmart, and she followed him by car from the Walmart parking lot almost to Weatherford. Father's employer, the Fort Worth Police Department (FWPD), conducted an internal affairs investigation, ultimately closing it and ruling out Mother's complaints based on her lack of credibility.

Sam was born at the end of December 2014. Mother was acting bizarrely at the hospital when it was time to discharge the infant, so the hospital did not want to release him to her. The hospital contacted Child Protective Services (CPS)—the investigative arm of the Texas Department of Family and Protective Services (TDFPS)—who called Father to pick up Sam.

### D. Mother Was Arrested for Assaulting Her Elderly Landlord and Resisting Arrest.

Within days of Father's taking Sam from the hospital, Mother regained legal

possession of him, and she soon moved to Denton County with her two children.

In August 2015, Mother was charged with injury to an elderly person and resisting arrest after she allegedly assaulted her elderly landlord (Landlord) in Denton. Adult Protective Services (APS) supervisor Laura Gutierrez investigated the case. Allegedly, Landlord woke up to a noise about 3:00 or 4:00 a.m. on August 30, 2015, went downstairs, saw Mother in his office, and asked if he could help her. Mother then "lunged at him, grabbed his skin under his arms, and pulled him toward her." She then repeatedly threatened to slit his throat. He tried to break free. She finally pushed him away and ran upstairs, repeating her threat to slit his throat. He had fingernail marks and scrapes on both sides of his chest. Landlord testified that Mother did not look normal during the incident. He had never seen her wide-eyed "like that." He and his wife called 911.

The police came in the middle of the night, so Adam and Sam were asleep but present at the time of the alleged assault and initial interaction with police. The police went upstairs to speak with Mother, who denied Landlord's allegations and woke the children by yelling at the police officers. Landlord heard the commotion from downstairs. The arresting officer testified that:

- The marks he saw on Landlord were consistent with his having been grabbed as described;

- Mother put the children in danger when the police were trying to handcuff her by going to the bed where Sam lay, jumping on the bed, and grabbing Sam instead of submitting to police custody;

5

- Mother resisted arrest, yelling about the children getting taken away;

- Adam woke up from all the yelling;

- Adam seemed really scared and was shaking;

- The officer put Adam on the bed with Sam and then put Sam in a bouncy seat;

- The officer calmed Adam down;

- Mother appeared to be under the influence of some substance because her pupils were very dilated, but she stated that she had not taken Adderall for a couple of days; and

- Mother's resisting arrest charge was still pending in Denton at the time of the termination trial.

Mother denied in her testimony that she had ever threatened to slit Landlord's throat but admitted that she had told him before the incident that she would defend herself if he hurt her. Mother also claimed that Sam was too young to be emotionally affected by the incident and that Adam bounced back and asked no questions about it. Similarly, Patricia Kaminski, a counseling clinical psychologist whom Mother called as an expert witness (Mother's Psychological Expert), testified that in her review of the police officer's body-cam video, she did not see that the children were scared. She admitted, however, that Mother's waking up the children during her arrest was not in their best interest.

APS supervisor Gutierrez testified that (1) Landlord and his wife were very afraid of Mother, afraid of retaliation, and intimidated by her and (2) the allegations of physical abuse of Landlord and emotional abuse of his wife and him were

substantiated.

Mother admitted that things had been tense at the Denton home, so much so that she and the children had left for six weeks in the summer and stayed with friends. When asked why she went back to the Denton home after that six-week period, she testified that she "didn't know really what to [do] because it just felt like [she] was stuck in a mess."

###### E. The Conditions of Mother's Bedroom and the Bathroom She Shared With Her Children at the Denton Home as well as Landlord's Testimony Suggested Neglect and Drug Abuse.

Open Adderall capsules were found in Mother's bedroom after her arrest. Mother was prescribed Adderall for ADHD. Maurice Saah, Professor of Chemistry (Mother's Drug Expert), testified that one way to take Adderall is to open the capsules and mix the drug with a substance like applesauce, which people who have trouble swallowing do. However, Mother's Psychological Expert testified that open capsules would not be consistent with taking Adderall as prescribed and that the open Adderall capsules collected at the Denton crime scene raised a concern that Mother was abusing her medication.

Landlord testified that:

- Mother's filthy room conditions at his house would not have harmed the children;

- On the other hand, Mother's filthy bedroom and the bathroom conditions that he had complained to her about—dirty, moldy bottles, old food, smelly clothes, dirty linens, and an unsanitary, urine-stained toilet—represented neglect of the children's health;

7

- He never saw Mother abuse the children or refuse to be attentive to their needs;

- However, his wife and others had told him that Sam would cry endlessly in the early morning hours, and Adam would get in bed with Sam and try to feed him;

- Adam would not wake Mother up when Landlord's wife asked him to; and

- Landlord had seen Adam acting afraid of Mother.

Mother admitted that Adam was not allowed to wake her up except in an emergency.

**F.      Mother and Her Sons Lived in a Fort Worth Boarding House for Most of 2016, and More Evidence of Neglect and Crime Accumulated.**

Mother testified that after the Denton County incident, she and the children lived in a church member's house until January 2016, when they moved to a Fort Worth boarding house. The landlady (Landlady) of the Fort Worth boarding house testified that:

- Mother left her children unattended when she would go out at night;

- In May 2016, Mother left the children alone two or three times per week, staying gone three to four hours sometimes, and returning after midnight;

- Landlady saw the children outside of their room only once when Mother was out;

- Landlady heard Sam crying at night on multiple occasions when Mother was gone;

- Adam missed school three or four times per week;

8

- Mother's room smelled like dirty diapers even from the hall;

- Landlady was concerned near the end of Mother's lease about the children not being fed properly;

- Adam asked Landlady for food repeatedly;

- Landlady ended up buying food for the children; and

- Adam set the stove on fire baking unsupervised.

Mother offered conflicting testimony from her former housemate, Ronald O'Rourke, who testified that in the ten months they both lived in the boarding house:

- He had no concerns that the children were neglected or abused;

- He had no knowledge of the children being left alone;

- He babysat for Mother more than a few times at prearranged times, approximately once a month, for 45-minute to two-hour periods;

- The children had plenty of food and appropriate nourishment;

- He and Mother both went to the kitchen when they smelled burning while Adam was baking in the stove-burning incident; and

- There was no smell upstairs (where Mother's room was) after the plumbing was fixed in early summer.

Father testified that:

- From September to December 2016, Mother brought Sam to the Tarrant County Family Courthouse for Father's supervised visits;

- Sam was not very clean, he smelled bad, and his scalp was inflamed and scaly; and

- One time when it was really cold outside, Sam's clothes were drenched, and he had soiled himself.

### G. After Mother Stopped Living at the Boarding House, She Was Caught Stealing from Landlady and Another Housemate.

On December 24, 2016, while Adam was with Ex-Husband in Florida for the holidays, Mother left Sam with a babysitter and was then caught on tape stealing from other people in the boarding house that she and the children had recently vacated. On December 26, FWPD Officer Joseph Preston responded to a burglary report at the boarding house. Landlady told him Mother had broken into Landlady's room and another tenant's room and stolen things. Landlady showed Officer Preston surveillance video footage showing Mother entering the boarding house and Landlady's room and taking things, and he secured a search warrant for Mother's room at the boarding house.

The room Mother and the boys had shared at the boarding house was very dirty. Multiple plates of half-eaten food lay around. There was a heavy urine smell, mostly from the closet. A Pack 'n Play containing big pillows and blankets, all heavily stained, was found in the closet. Officer Preston testified that he found several open, dirty diapers throughout the room and in the closet. "[H]aving the food, having the filth from the urine . . . coming from the closet, the dirty soiled diapers and whatnot, we crossed a line between messy. It was . . . definitely strong on the nostrils, burned the nostrils when you walked in. And it was pretty bad . . . ." He opined that the conditions would have endangered a two-year-old:

> The closet—one, a child should not be kept into a closet. It's not ventilated, nothing like that. Then you want to add the filth from the

urine. So now we have a poor ventilated room [in] which a child is supposed to be sleeping with improper bedding. It was definitely a dangerous situation for the child to be in.

Now, just for the general room of the child, if the child was not actually in the pack-and-play and was actually in the bedroom portion of it, the dirtiness . . . and everything else that was found throughout the room, you can take your pick between choking hazard to knives, forks laying around for the child to pick up. There was plenty of hazards for the child. Child should not be in the room, in my opinion.

Officer Preston secured an arrest warrant for Mother on December 30, 2016. That night, Mother went back to the boarding house. On January 2, 2017, Officer Preston reviewed camera footage of Mother entering the boarding house late on the night of December 30, 2016, holding a knife in forward position. Mother testified that she picked up a knife in the boarding house's kitchen to pry the lock open to her locked room and that she returned the knife to the kitchen before she left; she denied threatening anyone with it or entering the boarding house with it.

### H. Sam Was Removed in January 2017 After He Was Found Barricaded in a Closet When Mother Was Arrested.

On the afternoon of January 5, 2017, the FWPD arrested Mother at her former attorney's Fort Worth apartment/office (apartment). She testified that he had allowed her to stay there temporarily while he was out of town. When the police arrived at the apartment, they noticed that its front door was damaged such that it would not lock. Officer Preston testified that that was a threat to a young child and that he saw no sign that Mother had attempted to somehow secure the door otherwise. When the police spoke to Mother, she directed them to Sam's location—a closet with a big

11

plastic tub blocking it. She testified that Sam had been napping when the police arrived. Clothes and dirty diapers were on the closet floor, and things were tossed about in the closet.

The evidence on Sam's condition when the police found him was conflicting. TDFPS testified that he had a dirty diaper. Mother testified that he had a wet diaper, but the police uncuffed her to change it, and that he was happy and playing around. Officer Preston did not recall unusual smells regarding Sam, nor did he recall Sam being dirty. Officer Preston testified that:

- Sam had a pillow or stuffed animal but no water or blanket;

- Sam was very thirsty and asked for a drink;

- Sam was very scared and very emotional;

- Sam was upset and crying; and

- Sam played and ran around after he calmed down.

At trial, Mother admitted that she had put Sam in the closet and had blocked the closet with a storage tub to keep him in because he kept getting out. She stated the door was not shut all the way, but Officer Preston testified that according to the CPS investigator, who (along with other FWPD officers) arrived at the apartment before Officer Preston, the closet was completely closed and barricaded. The closet also held paper towels and plastic trash bags, a choking hazard.

Mother insisted that she never punished either child by putting him in a closet

and that she only put Sam in the closet in this instance as a safety measure.  Mother's Psychological Expert could think of no reason why barricading Sam in the closet for a daytime nap was necessary; Mother could have protected him by staying awake.

Officer Preston testified that based on what he saw at both the boarding house and the apartment, he had great concerns for Sam's welfare.  Had there been a fire or any other emergency situation, Sam would not have been able to escape.

TDFPS removed Sam and placed him in his foster home that evening.  Foster father Ken Howell testified that:

- Sam arrived wearing a wet diaper with a foul odor that was neither feces nor urine;

- Sam had a severe diaper rash with three open sores, the worst that Howell had ever seen;

- The scars lasted more than a month;

- Sam was so pale that his veins were visible;

- Sam was dirty with a flaky, scabby scalp;

- Sam's knees were puffy and bluish; and

- Sam's stomach was bloated, considering his thinness.

The police arrested Mother for the boarding-house offense and took her to Tarrant County Jail.  Mother was released on bond and agreed to work TDFPS services.

After leaving the jail, Mother lived at a women's shelter for four to five weeks and then rented a room from March to May 2017 in Haltom City.

**I. Less Than Five Months After Sam's Removal, Mother Was Arrested in Georgia and Spent About Six Months in Jail.**

Meanwhile, Ex-Husband in Florida did not return Adam after his December 2016 possession, so in May 2017, Mother drove to Ex-Husband's home in Florida, assaulted him with pepper spray in front of Adam, strapped Adam into her rental car, and drove away. Mother testified that Ex-Husband hit her before she pepper-sprayed him and took Adam. Regardless, Mother admitted that the conflict scared and "rattled" Adam.

Mother was arrested in Georgia for battery and interference with child custody. Adam, who was with her at the time of arrest, told the police that he was slightly affected by the pepper spray. He was ultimately returned to Ex-Husband.

About two weeks after her Georgia arrest, Mother was extradited to Florida. When Mother arrived at the Florida jail, she had visible bruising on her face and abrasions on her right leg. The bruises were at least a week old. Mother told the Florida officers that the bruises and abrasions were a result of her physical struggle with Ex-Husband. However, she had not told the Georgia troopers who arrested her that Ex-Husband had hit her, and one of them testified that he saw no marks or bruises on her.

The Florida court issued a no-contact order against Mother regarding Adam and Ex-Husband. Mother was in jail in Florida until October 2017. Several months after her release, she signed a pretrial diversion contract with the State of Florida, in

which she admitted committing battery against Ex-Husband and the no-contact order was extended. The contract provided that she had no criminal history.

Mother testified that she did not know if her trip to Florida was in Sam's best interest.

From Florida, Mother was extradited to Texas regarding the boarding-house charges. She was released from Tarrant County Jail in mid-November 2017, stayed in a hotel about ten days before getting an apartment in December 2017, and obtained an extension to complete her TDFPS services.

In February 2018, a warrant was issued for her failure to appear at a Tarrant County criminal court hearing on her boarding-house case.

### J. Mother Was Arrested in Grapevine in April 2018, a Few Months Before Trial.

Gaylord Texas Convention Center Emergency Medical Technician/Security Officer Nicole McLear testified:

- She was working third shift on April 28, 2018;

- She was called to a possible domestic assault in the early morning hours on the 8th floor of the Lone Star Tower;

- She saw Mother on the security cameras on the fourth floor and went to her;

- Mother was waiting by the elevator;

- Mother was barefoot, "extremely angry," "disheveled," "unusually emotional," and yelling at her and appeared to be under the influence of some substance because she was slurring her words;

15

- Mother told McLear that a man had thrown her out of his hotel room by her neck;

- McLear saw no marks on Mother's neck or signs of assault but admitted that an assault could have caused Mother's frazzled appearance;

- Mother admitted drinking;

- When McLear called the police, Mother became angry because she had outstanding warrants;

- Mother saw the police after she and McLear exited the elevator on the first floor, and she ran away from them;

- Mother told "about 12 different stories";

- Mother would not tell the police her assailant's name and would not identify herself; and

- The police arrested Mother.

Mother testified that the incident occurred because she "just got freaked that moment because of everything that happened with [her recently deceased] attorney" and "was really distraught about it and . . . made some poor choices."

Mother's Grapevine arrest was based on the Tarrant County warrant for failure to appear as well as new charges of public intoxication, failure to identify, and resisting arrest. Mother was taken to Tarrant County Jail. She soon pled guilty to Class A misdemeanor theft regarding the December 24, 2016 boarding-house incident, was placed on two years' deferred adjudication, and was released. The Tarrant County charge of failure to identify and the 2015 resisting arrest charge in Denton County were still pending at the termination trial.

16

**K.** **The Trial Court Heard Evidence That Mother Was Suicidal a Week Before Trial Began.**

Sister testified that a friend of Mother's contacted her about a Facebook post ostensibly authored by Mother regarding threats to harm herself, and Sister gave it to TDFPS. TDFPS testified that Mother threatened to kill herself on Facebook a week before trial and therefore TDFPS was worried about her mental health. Mother denied that the Facebook post was hers and denied being suicidal.

## DISCUSSION

In her first issue, Mother challenges the legal and factual sufficiency of the evidence supporting the endangerment findings against her, arguing that "[d]espite periods of instability," by "the time of trial [she had] completed her services, rectified her pending criminal matters, and secured stable housing and employment" and TDFPS had failed to prove that she had engaged in a deliberate course of conduct or that Sam's environmental conditions had risen to the level of neglect. In her second issue, Mother challenges the legal and factual sufficiency of the evidence supporting the best-interest finding against her, arguing that breaking the bond between Sam and her would be against his best interest and that TDFPS did not prove that she could not meet his present and future needs.

## I. TDFPS Must Prove Its Case by Clear and Convincing Evidence.

For a trial court to terminate a parent–child relationship, TDFPS must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy

17

one ground listed in family code section 161.001(b)(1); and 2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

## II. We Determine Whether the Evidence Is Sufficient to Support Termination Findings.

To determine whether the evidence is legally sufficient to support the trial court's endangerment and best-interest findings, we look at all the evidence in the light most favorable to those findings to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(2). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *J.P.B.*, 180 S.W.3d at 573. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child

relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that Mother endangered Sam or placed him in an endangering environment and that termination of the parent–child relationship would be in his best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief regarding an endangerment ground and the best-interest ground, then the evidence is factually sufficient to support termination. *C.H.*, 89 S.W.3d at 18–19.

## III.  The Evidence Sufficiently Supports the Endangerment Findings.

### A.  Child Endangerment Can Occur When the Child is Not Present and When a Parent's Conduct Is Not Aimed at Him.

As this court has often discussed,

Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who

19

engaged in conduct that endangers the physical or emotional well-being of the child. Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone. . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.

*In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (citations and internal quotation marks omitted).

"[E]vidence of abuse of another child, coupled with a present or future danger to the child in question, is relevant to determine whether a parent has engaged in an endangering course of conduct." *In re E.A.W.S.*, No. 02-06-00031-CV, 2006 WL 3525367, at *10 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.); *see also In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *6 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.). Additionally, threats to commit suicide may contribute to a finding that the parent engaged in a course of conduct that was detrimental to a child's well-being. *In re J.A.T.*, No. 04-17-00386-CV, 2017 WL 4937960, at *4 (Tex. App.—San Antonio Nov. 1, 2017, no pet.) (mem. op.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Finally, a parent's criminal conduct or imprisonment is relevant to whether a parent

has engaged in a course of conduct that endangered the well-being of the child. *In re K.S.*, No. 02-18-00191-CV, 2018 WL 4659120, at * 3 (Tex. App.—Fort Worth Sept. 28, 2018, no pet.) (mem. op.) (relying on *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.)).

**B.     Clear and Convincing Evidence Supports the Endangerment Findings.**

Sufficient endangerment evidence on many fronts supports the trial court's endangerment findings. The trial court heard evidence that:

- Mother hit a two-year-old Adam in the head hard enough to scare the toddler observing it;

- Mother repeatedly locked a four-year-old Adam in a room long enough for him to urinate and defecate on himself;

- Mother let infant Sam cry in the early mornings, and four-year-old Adam did his best to feed the baby because he was afraid to break her rule and wake her up;

- Mother raised her young sons in filthy, unsanitary conditions;

- Mother assaulted an octogenarian and then put her sons at risk while resisting the resulting arrest;

- Mother entered her former boarding house to steal, only to be caught on camera;

- Mother re-entered the boarding house a few days later with a knife;

- Mother barricaded two-year-old Sam in a closet so long that he was "very thirsty" when he was released and had a diaper rash with three open sores that left scars for a month;

- After Sam's removal, Mother drove to Florida, pepper-sprayed Ex-Husband, and forcibly took Adam, who was also hit with the spray;

21

- Mother did not see Sam for more than six months; and

- Mother chose to miss four visits with Sam in April 2018 because a warrant was pending for her arrest, but in that same month, she chose to become intoxicated in a public place, refused to identify herself to law enforcement, and resisted arrest again.

Mother admitted at trial that she was aware that arrests and convictions could violate her Tarrant County and Florida probation agreements. TDFPS testified that there was probably not a good chance Mother would stay out of trouble, based on her past behavior. If Sam were returned to Mother and she committed new offenses, or her probation was otherwise revoked, Sam would be removed again, which would give him no stability.

The evidence showed that Mother neglected both sons, trapped both sons in confined places for extended periods of time, engaged in violence in their presence, chose to engage in criminal activity (both before and after Sam's removal) repeatedly with no thought to the children's safety or well-being, and then attempted to exploit them to avoid the consequences of her actions. As TDFPS testified,

- a person who continues to engage in a course of criminal conduct endangers a child's emotional and physical well-being; and

- it hurt the children to witness Mother's arrests and also demonstrated her instability as a parent.

We agree. Accordingly, applying the appropriate standards of review, *see J.P.B.*, 180 S.W.3d at 573 (providing legal-sufficiency standard of review); *C.H.*, 89 S.W.3d at 18–19, 28 (providing factual-sufficiency standard of review), we hold that the

22

evidence is legally and factually sufficient to support the trial court's endangerment findings, and we overrule Mother's first issue.

## IV. The Evidence Sufficiently Supports the Best-Interest Finding.

In her third issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's best-interest finding. In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (1) ground. *E.C.R.*, 402 S.W.3d at 249; *C.H.*, 89 S.W.3d at 28. We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest:

(A) the child's desires;

(B) the child's emotional and physical needs, now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the child's best interest;

(F) the plans for the child by these individuals or by the agency seeking custody;

23

(G)     the stability of the home or proposed placement;

(H)     the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### A.     The Risks Sam Would Face in Mother's Care Support the Best-Interest Finding.

The most significant best-interest evidence is the endangerment evidence. Sam's emotional and physical condition at the time of removal is also compelling. In addition to describing Sam's physical condition on the day he was removed and placed in foster care—the thin body with bloated stomach; the wet diaper with an unfathomably foul odor; the severe diaper rash and open sores; the visible veins and flaky, scabby scalp—foster father Howell testified that at the beginning of Sam's placement, he would grab a blanket, his bear, a drink, and food; tell the foster parents good night; and shut himself in his closet. The Early Childhood Intervention (ECI)

therapist believed that Sam's issue with the closet was trauma-related. By the time of trial, Sam was no longer shutting himself in the closet. Sam also had bath issues initially. He fought and screamed during his first bath when water touched his head. That behavior continued over time, but by trial, Sam liked baths. Sam also had bedtime fears at first. The foster parents would have to put him in his crib only after he was asleep. However, by trial, Sam would fall asleep in his own bed after story time.

Sam was speech-, developmentally, and cognitively delayed when removed from Mother. The CASA volunteer testified that he was also timid, kept to himself, and did not engage much. While in foster care, Sam received ECI, including occupational and speech therapy, until he aged out of ECI at the age of three. Then the foster parents put him in social therapy and trauma-informed therapy. By the time of trial, Sam was thriving, doing well in daycare, and was very smart and very social— a "typical three-year-old boy" who was a lot of fun to be around.

Mother admitted that Sam's life had been filled with chaos before the removal and that she bore some blame for that. She further took responsibility for the August 2015 Denton arrest; for the events that led to her January 5, 2017 arrest and Sam's removal; for her conduct leading to her May 2017 arrest; and for her conduct leading to the April 2018 arrest. Although Mother admitted that she had "done some stupid things," she claimed that she had still "made efforts to progress," "do services," and "visit [Sam] whenever [she] could."

25

Mother's Psychological Expert testified that a parent's engaging in criminal conduct and being away from home harms the child and that past behavior is the best predictor of future behavior. TDFPS testified that Mother had a history of making poor choices resulting in bad consequences and that her bad pattern was to make decisions that would endanger the children and lead to her arrest. She had not changed that pattern. TDFPS remained concerned that if Sam were returned to Mother, her decisions would keep putting him in danger. Finally, at trial, Mother was on probation for the 2016 boarding-house theft and the Florida battery, and other charges were still pending. Thus, while TDFPS conceded that Mother had made some improvements in her ability to safely provide for Sam—for example, she had achieved stable housing by the end of trial—TDFPS did not believe that she showed sufficient stability to support reunification.

**B.    The Evidence Demonstrates that Mother and Sam's Bond Decreased During Her Six-Month Jail Stay, but Having Spent More Than Eighteen Months of His Young Life with the Foster Family, Sam Was Bonded with Them at Trial.**

Mother testified that the trial court should not terminate her relationship with Sam because he was bonded with her, he needed a mother, and she was trying. Mother testified that during visits, she reinforced how special Sam was to her by cuddling and playing with him and reinforced how important learning is by bringing educational toys and tracking his progress.

There is no dispute that Mother and Sam were bonded. The CASA volunteer

26

testified that in the visits she observed in February through May 2017, Mother was on time, Sam was excited to see her and would cling to her, and Mother would get down on his level to play and bring appropriate snacks and toys. TDFPS similarly testified that every visit from January 2017 to May 2017 before Mother left for Florida went very well. Foster father Howell testified that Sam cried when he was separated from Mother in the early visits and before May 2017, he would get upset when she missed a visit.

But when Mother was in jail from late May to November 2017, she and Sam, who was not yet three years old, had no visits or contact for six and a half months. (TDFPS admitted that Mother had asked for visits via Skype while she was in the Florida jail, but TDFPS rejected that request.) After Mother's confinement ended and her visits with Sam resumed, Mother often arrived more than fifteen minutes late. Although she still behaved appropriately, the bond appeared to have waned, according to both the CASA volunteer and foster father Howell. At the foster home, Sam no longer talked about her or spontaneously asked about her or about seeing her.

Mother's Psychological Expert testified that the long gap in visits because of Mother's confinement was not a permanent bond-breaker and that the videos she had reviewed of Mother and Sam together after that gap showed that the bond had been recreated. The expert also testified that divesting Sam of his bond with Mother was not at all in his best interest.

But Mother also missed visits with Sam in March and April 2018 because she

was afraid that she would be arrested on pending warrants. Sam was at the TDFPS office waiting for Mother to arrive for three of the four April 2018 visits she chose to miss.

On the other hand, Sam had been with the foster parents for a continuous period of almost twenty months and had bonded with them and his 1½-year-old foster brother that the foster parents planned to adopt.

### C. The Evidence Shows that the Foster Parents Were Meeting Sam's Needs and Could Meet His Future Needs.

The foster parents loved Sam and planned to adopt him if the trial court terminated the parents' rights. Foster father Howell testified that he and the other foster father met Sam's physical and emotional needs. Howell worked only twelve days a month for an airline; the other foster father was at home every day.

The CASA volunteer testified that:

- The foster parents had a great, safe, very well-kept home;

- Sam's bedroom was decorated with posters and tents; and

- The foster parents met all of Sam's needs.

She recommended termination and adoption by the foster parents.

That was also TDFPS's recommendation. TDFPS testified that:

- It had no concerns about the foster home or the foster parents' abilities;

- The foster parents were stable, were meeting Sam's present needs, and were capable of meeting any future needs;

- There were no present or future dangers in the foster placement; and

28

- The foster parents' long-term goal was to raise Sam to his "full potential" and "love him, care for him, and meet his needs."

Mother's Psychological Expert maintained that Mother's parental rights should not be terminated and that she should maintain some role in Sam's life. However, the expert also acknowledged why the foster parents would be hesitant to allow Mother to remain in Sam's life. The Psychological Expert also said that contact with Mother's extended family would be healthy for Sam.

The foster parents were open to the idea of Sam continuing his relationship with his extended family on Mother's side but very concerned about continued contact between Sam and Mother because of her behavior during the pendency of the case and the testimony they heard at trial. During a supervised visit, Mother had asked foster father Howell to meet her alone outside the TDFPS building. He refused, and then her "attitude and demeanor escalated," making him uncomfortable. Nevertheless, the foster parents indicated they would be willing to set up a website where they would post pictures of Sam for Mother and she could post letters for him.

**D. The Evidence Shows that Mother Could Not Meet Sam's Present and Future Needs.**

Mother testified that termination was not in Sam's best interest and described her plans should Sam be returned to her:

- The bedroom in her apartment was Sam's;

- She had food and clothing for him, as well as books, learning materials, and toys;

- She had pre-enrolled him in a pre-K school based on the technology it offered; and

- She knew that a child's first five years and early education were developmentally important.

Mother admitted that Sam's life with her had been unstable and that the chaos in the past had not been good for him but contended she planned to change that pattern in the future.

Although Mother testified that she had developed an appropriate safety net and plan for Sam going forward, she admitted that she was still working on it and was at "the beginning stages of getting back on [her] feet," and she conceded that "things might not be together" yet. Nevertheless, Mother contended that Sam should be returned to her because she "fe[lt] like [she had not] been given a chance." We note that Mother was granted a case extension after her six months in jail.

Mother's Psychological Expert confirmed that Mother was not in a position to meet all of Sam's needs: "I think that she's shown enough problematic judgment where, at this point, I don't think that she has the skill set or supports to single-handedly manage [her children] well."

TDFPS was concerned about Mother's parenting abilities, her meeting Sam's future emotional and physical needs, and the present and future dangers to his emotional and physical safety that living with her would bring. TDFPS testified that there were no excuses for Mother's acts or omissions: Mother kept making the wrong choices and not taking responsibility, and "that would just have a negative impact on"

Sam. As TDFPS explained, the services Mother completed should have helped her decision-making but did not. She had completed parenting classes and her individual classes by the time of her missed visits with Sam and latest arrest in April 2018.

The CASA volunteer testified that

- She was concerned about Mother's stability;

- Mother had eighteen months to "get[] her life back together" but showed no progress;

- Mother's skipping visits with Sam because of pending warrants indicated instability: Sam was removed originally because the police were serving Mother with an arrest warrant. Mother was therefore still engaging in a "consistent pattern" of endangering activity as late as April 2018; and

- Even though Mother completed court-ordered services, she did not appear to have undergone a permanent behavior change because she still engaged "in activities that require police attention," referring to Mother's April 2018 arrest that occurred after she had completed some court-ordered services.

### E. We Uphold the Best-Interest Finding Against Mother.

Having reviewed all the evidence according to the appropriate standards of review, *see J.P.B.*, 180 S.W.3d at 573 (providing legal-sufficiency standard of review); *C.H.*, 89 S.W.3d at 18–19, 28 (providing factual-sufficiency standard of review), we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding, and we overrule Mother's second issue.

### CONCLUSION

Having overruled both of Mother's issues, we affirm the trial court's judgment.

31

Per Curiam

Delivered:  April 18, 2019